This is Trey Barrett's. They're waiting for you. What did you say? They're waiting for you to start. You're waiting for me? No, Your Honor, I'm waiting for me. I apologize. That's all right. Okay. May it please the Court. My name is Clay Smith. I'm a Deputy Attorney General for the State of Idaho, seated at council table. On my immediate left is Donald Farley, who is co-counsel, and on his left, Attorney General Wosden. The Supreme Court in the Saucere case has specified the order of battle in qualified immunity appeals such as the one before the Court today. The first question is whether the plaintiffs have alleged a constitutional violation, essentially the same inquiry that is made under Rule 12b-6. If a constitutional violation is deemed to be, in this instance, alleged, the second inquiry is whether or not the constitutional right involved was clearly established at the time the violation is alleged to have occurred. And that determination must be made in the specific context of the case itself. The context of this case is a competitive rights dispute in which one unsuccessful applicant for a public contract alleges an equal protection violation because of the government's determination to issue a contract, the contract to another applicant, or not to issue a contract at all. No fundamental right or suspect classification involved in this case. As a consequence, at most, rational basis analysis applies. This case is, in the appellant's view, a paradigmatic class of one equal protection claim in which the plaintiff alleges, in this instance, that it was discriminated against for arbitrary reasons. That is to say, it is not a class-based dispute. We believe in many respects this case is controlled with respect to both inquiries that Saucere requires by the Supreme Court's recent decision in Inquist v. Oregon Department of Agriculture, a case from this Court in which the Supreme Court affirmed Judge Tashima. By way of background, at the time of statehood, Congress granted Idaho parcels of land, sections of land throughout the state for school trust or endowment purposes. Under the state constitution, those lands must be managed to produce, the maximum long-term financial return for the beneficiaries, i.e., the public schools that benefit from the land. These lands have been leased and sold, and the overall management authority with respect to that leasing and selling is committed to the State Board of Land Commissioners. That board is composed of five statewide elected officials, in fact, the five highest statewide elected officials in Idaho, the governor, the secretary of state, the attorney general, the state controller, and the superintendent of public instruction. Day-to-day administration, however, of state lands generally, and these lands in particular, is committed to the Idaho Department of Lands. This dispute involves three decisions made by the land board during the calendar year 2007. Here, Lazy Y is complaining that the State has discriminated against it in groups with ties to conservationists, and what they're asking for is a chance to present evidence that Idaho's position about administrative costs is a pretext. So the judge didn't grant you a motion to dismiss, so you're not out of court. You're just not out easily. So it's just a matter of going to trial, right? Your Honor, we would suggest no, because the notion of pretext, we would argue, should be foreign to ordinary equal protection analysis under the rational basis test. As this Court has explained in several decisions, I mean, Derez and Squall Valley are perhaps the most notable for our purposes. Pretext, the notion of pretext includes twin concepts. One is either the ability to show factual inaccuracy, factual falsity. But Lazy Y was the highest bidder. They were, Your Honor. Just to cover that particular factual basis, there were seven leases at issue in terms of leases that went to auction in June and August of 2007. The total difference in bids with respect to the first set of auctions, which included six leases, was $675. The second lease or the seventh lease auctioned in August of 2006, the difference there was $400. Now, that is a difference of, in total, $1,075. These are 10-year leases. So per lease, if we aggregate the simple division, the annual difference on the basis of the bids per lease was $15.36 a year, a truly minimal amount of money. As the administrative regulations appended to the appellant's brief shows, the bid is in addition to a lease amount that is paid annually. The lease amount is determined administratively based on essentially the carrying capacity in terms of animal units for various parcels. So the purpose of the bid is to, in a conflict auction situation as we have here, the purpose of the bid is to attempt to get applicants to pay money in addition to what they would So for our purposes, the difference with respect to the leases viewed as a whole over the course of the 10-year lease period approaches de minimis levels. And that, indeed, is the key, the keystone to Lazy Y's position in this case, that difference, roughly $15 a year, amounts to an equal protection violation, because absent that difference, there presumably would not be before this Court. Now, what the record shows in terms of the allegations of the complaint and those documents which we argue were properly or should have been properly considered by the Court, three of which were considered by the district court, what the evidence shows, what the facts show, is that all of these parcels of land are intermingled as part of a larger grazing allotment, are intermingled with lands that are owned by private parties, by the Federal Government, and that the successful applicants in each instance, the second high bidder, had existing leasing operations on neighboring lands. And the Department of Lands viewed that as significant, and the Department of Lands viewed that as significant, because this is open-range land in the sense that there is little or no fencing, and cattle can migrate back and forth between the state parcel and parcels owned by other entities. But by that logic, how can an outsider ever come in and win one of these auctions? Win or lose the auction, whether it's a small amount or a large amount, by whoever wins, you've got a winner, and now you're distinguishing between the winner and the loser by saying, well, he hasn't been here before, he doesn't have adjacent land, or he hasn't put fences on it or something, you more or less preclude somebody who's not already operating in your state from coming in, aren't you? As a practical matter, that may be the effect. But I have two points to make about that response, if I might. First, that it would – that the – considering the administrative cost issue might make it difficult for others who do not have those kinds of working relationships But didn't they offer to pay the administrative costs? And defense. They did, but there were two problems with that offer. First, it was after the fact in the sense that it was not part of – Well, your argument that there were administrative expenses was after the fact too. That's correct. But in terms of the land board's consideration, that would have required them to essentially award a lease based on conduct that occurred after the auction itself. Now, this Court may disagree with the appropriateness of doing things that way. But again, that does not raise an equal protection claim. It might raise an appropriate claim under the Idaho Administrative Procedure Act in terms of a record-based review allegation that the board, the land board, abused its discretion or acted arbitrarily or acted capriciously. But that is obviously enough a statutorily created mechanism for reviewing land board and other agency decisions. The second point I wanted to – I think is important to make with respect to the post-auction offer is that it was conditional, at least in part. The first – there were really two such offers, one with respect to the leases that were auctioned in June of 2006 and were considered by the board at its August 2006 meeting. And then there was a second offer made in connection with a lease, an auction that occurred in August of that year and the results of which were considered by the land board at its September 2006 meeting. With respect to the June auctions considered at the August meeting, Lazy Y offered $30,000 plus any additional amounts related to administrative costs that were reasonable. The Idaho Department of Lands, however, had calculated the administrative costs for the – if you aggregate it across the leases at approximately $45,000. So what you had here was a recipe for disagreement over what was reasonable or not reasonable. And it was a perfect – it was perfectly rational, which is really the test. Of course, he raises the question, Lazy Y, of whether you had any administrative expenses and you calculated this. Or was the calculation based on had you any prior administrative expenses? That's correct, Your Honor. But, again, going back to the rational basis test, this Court and the district court is really not on the basis of fact-finding with respect to whether or not the administrative cost rationale is reasonable or not. In this instance, we knew – I'll put it this way. The facts are clear that there could be difference in administrative costs by virtue of the land ownership – excuse me, the leasing patterns that I previously discussed – and that it was therefore plausible, which is really the test, at least debatable in the test from equal protection cases. It was at least debatable that there would be difference in administrative costs. And that is really the, I think, the question. And that is a question of law, not of fact. So, for example, the State, the defendants generally, should not be put to the task of having to prove that the administrative cost would be $45,000 or $15,000. That involves the kind of fact – of courtroom fact-finding that the Supreme Court has made clear is inappropriate in a rational basis. Well, listen. Standard. You know, we've had very good briefs, and you may want to save some time, because we've got your argument well in hand, as you can discern. I just have one further point to make, and then I will reserve the remainder of my time for rebuttal. And that's the notion of discretion, and this brings in the Enquist decision. Going back to a 1914 decision cited in our brief, Barber-Lumber v. Gifford, the Idaho Supreme Court has recognized that the Idaho – that the land board has great discretion in determining what will generate the greatest long-term return for the beneficiaries of the trust. It is that discretion, we believe, that is being attacked in this case. And it's precisely that kind of discretion that the Supreme Court concluded with respect to the employment context that precluded application of a Class of One theory at all. Again, in this case, we have two issues, one of which is whether a constitutional violation is alleged. The second is whether the involved constitutional right at issue is clearly established. In this instance, even if the Court were to answer the first question positively, we believe in light of Enquist, it cannot answer the second question positively. Thank you. May it please the Court. Laird Lucas, Boise, Idaho, for the Plaintiff Appley Lazy Y Ranch. I'd like to address just three points in my argument today, and the first is the procedural status of the case, the second is equal protection law, and the third is the impact of the Supreme Court's Enquist decision.  In terms of procedural status, we're here on a Rule 12b6 motion to dismiss. And Judge Pragerson, you authored an opinion in Heydrich v. Hunter, which we cite in our briefs, which talks about looking at qualified immunity at the 12b6 stage and how it's usually not a good fit, and although the State defendants have the right to take an interlocutory appeal on the denial of qualified immunity, you caution that it's often not a choice well exercised. And I think that caution is applicable here, because what we have is a record which is mostly extraneous evidence that they submitted to the District Court, which is mostly things that they say prove their view of the case, which the District Court excluded, rightly so, and from that, they fill their brief with factual assertions, and I've just underlined in their statement of facts every place they say that you should accept their view of the facts. But at the Rule 12b6 stage, that's obviously not appropriate. And what we have pled, and it's not conclusory allegations, it's very specific factual allegations, is that the State Land Board and the Department of Lands undertook discriminatory action that was motivated by hostility to my client, and they used pretexts and irrational reasons to deny them the leases. And we're not making this up. We have a ten-year history of disputes between conservation groups in Idaho seeking to use the marketplace to protect the environment, and that's because these are State school endowment lands that are held in trust, and there is a constitutional mandate approved by the United States Congress when it led Idaho into the union that says they're to be managed for maximum long-term return for the schools and subject to disposal at public auction. And public auction is the way that you maximize financial returns. Conservationists have sought to bid at auction, pay more for these leases, and then manage them differently to improve the lands. This is very different than the normal environmental model, and it's been seen in some other states, and it's aroused a lot of opposition. And we've gone to the Idaho Supreme Court. I've personally handled three cases in the Idaho Supreme Court and several more in the Idaho State Courts where time after time the State Land Board and the Department of Lands, because of political reasons, the ranching industry has a lot of political power, they violate their fiduciary duties, they turn down the conservationists' money, they come up with reasons for doing it, and the State Courts have said that's wrong. Time and time again we've cited many of those cases. So the law is clearly established that they cannot breach their constitutional mandate by avoiding auction and competitive bidding to maximize returns. And what happened in this case was that same pattern. They came up with another different set of reasons. Those reasons changed over time, and we've alleged them in our complaint. And at the end is when we saw this increased administrative cost rationale. One side question, if the State Courts regularly overturned their actions, what is it that led you to come to federal court? In part because we tried time and time again in the State Courts and it wasn't changing the behavior of the defendants. And Section 1983 allows for imposition of personal liability. I understand you couldn't come here. I'm just curious. It was an attempt to change the state of affairs, I guess, is what it is. And, of course, we do have legitimate Section 1983 claims. These are State actors acting under color of State law and violating my client's equal protection rights. And we concede that for current purposes the rationality test is what applies. And under rationality review, the law in this circuit is clearly established and from the U.S. Supreme Court's decisions going way back, that if a state treats people differently in how they're giving out government permits or licenses or contracts, and that's what we're talking about here is a license or a permit or a contract, a permit to use state lands for ten years, that if you discriminate on irrational or arbitrary grounds, and particularly if you do it for improper reasons, that violates the Equal Protection Clause. And, of course, we're alleging arbitrary and irrational action here. We've alleged that the increased administrative cost rationale is false and pretextual. We're prepared to prove that to a jury. But we've also alleged the ill will, the hostility, the vindictiveness, which comes after this ten years of fighting between conservationists and the land board and the Department of Lands over how to get at these state land leases. And we've cited a number of cases both from the Supreme Court and this circuit where that extra element of subjective ill will makes out an equal protection case. So the state defendants try to call this a class of one competitive rights case, which they say has no precedent and should be disfavored. What we say it is is it's a discrimination against a disfavored applicant for state leases where they use phony reasons to deny it to us. And that is reflected in so many of this Court's decisions going way back before the Village of Willowbrook v. Olek case, which was the Supreme Court's decision in 2000. That case affirmed that in a situation where a state denies an individual a state benefit, a license, in that case an easement, on arbitrary grounds or according to the concurring opinion, if there's the added ill will, you have an equal protection claim under rationality review. That's what we've alleged in detail in our complaint. I think we easily satisfy Rule 12b-6 analysis, including showing clearly established law in the district court so found. The big question is, I think, did the Supreme Court's decision in inquest just a few weeks ago change that analysis? And if you look at the inquest opinion, what you see is it talks about on page five of the slip opinion the unique considerations applicable to the government as an employer. Inquest held that a public employee can't raise an equal protection claim that they've been arbitrarily treated in losing their employment under this Olek decision. But it's specifically focused on the unique considerations of government employment, including the extensive regulation of employment in the workplace, the many Supreme Court decisions that have said that public employees may have less constitutional rights in a way because the government as employer has to be able to do its employment decisions without a lot of interference. And it specifically, again, on page five of the slip opinion, distinguishes between the government as a regulator and giving licenses. And that's what we have here, again, is giving licenses or permits versus employment. They're trying to say this is just like public employment, but it's completely different from that. Well, when you talk about a regulator, you think of regulating other parties, third parties, not ñ and I think their argument is here we're just pursling out our own resources, and that puts us in a different market. And, Your Honor, I understand that, but what the Supreme Court said in Olek is in the employment context, you have to be able to make subjective discretionary decisions. That does not apply here. Remember, we have an Idaho Constitution with the Idaho Admission Act, federal and state law, that set forth the very clear mandatory fiduciary duties on the state land board defendants to maximize returns using auctions. And what they've done in this case is said we don't have to pay attention to the auctions. We can inject these other considerations of cost that we never told you about before, that we've never, ever used before in any other thing, and we can suddenly say that that offsets it. But my point is there are very clear limits on their discretion here, bounded by the Idaho Constitution, set forth in Idaho Supreme Court decisions and many other decisions of the U.S. Supreme Court and other state courts about these Supreme Court decisions, Lassen v. Idaho, Arizona Department of Highways from the 60s, which again talks about these fiduciary duties and how much they limit the discretion of the state land managers. It's not like employment where they have subjective decision making. They have to award the leases to the high bidder unless there's really good reasons for not doing it that relate to the trust. I assume you're also arguing, though, that you're not a class of one anyway. Well, we don't think we're a class of one, and nowhere in our pleadings have we said a class of one. Maybe we are, and we go under that, but we believe we're a class of conservation applicants who have been discriminated against, and that was my primary theory. But I think when you read OLEC and you read, for instance, this court's decision in Squaw Valley Development Company, those were class of one cases in the sense that they were individual plaintiffs who said they had been discriminated against, but the focus was has the government been irrational or arbitrary? Has it been motivated by ill will or vindictiveness? Those claims are good equal protection claims whether or not you're a class of one, and again, I think Inquist makes that clear. It says the focus of equal protection is not on groups but on individuals, which is what we are. So whether we're a class of one or not, we have selective treatment. We have irrational treatment motivated by animus to my client, and it's not the normal animus of race or sex or religion, but it's a deep animus that the truth is this is happening in Idaho. Ranchers versus conservationists is a big battle. It's a big battle in other states, and whatever side of that battle you're on, the state land board should not be taking sides in that. Their duty is to the public schools and to raise money for the public schools, not weigh in favor of one industry or another applicant, and certainly not to come up with a whole set of reasons why they won't accept bids from a disfavored applicant. All right. That's a good argument. Thank you, Your Honor. With that, if there's no further questions, I will submit. All right. Two basic points on rebuttal, Your Honor. First, the ‑‑ if we assume that, and Mr. Lucas has accepted this assumption, that we're talking rational basis analysis in this case, motivation is irrelevant. The only issue is whether or not there's a rational ‑‑ there's a reasonable basis for what the board, the land board did. It need not even be the rationale or the reason why the land board acted. So motivation in and of itself is inappropriate, and that's ‑‑ Well, that's a very low standard to satisfy, the rational basis standard. It is indeed. Yeah, we know that, yeah. I understand. And I'm confident the Court does, but it's a critical point in this case. Second, with respect to the discretion issue, the board has a constitutional obligation to try to maximize long-term return, but it has a great deal of discretion in determining how best to do that. In this instance, they concluded that the minimal difference in bids, given the land ownership patterns and grazing patterns that I've discussed, was insufficient to overcome what they believe would be a net loss to the beneficiaries were Lazy Wise bids accepted. With that, I conclude because my time has elapsed. Thank you. All right. Good arguments on both sides, and we appreciate all your help. And this Court will recess until 9 a.m. tomorrow morning.
judges: Clifton, Smith, Sandoval